EARNSHAW v. BOYER.

(Circuit Court, E. D. Pennsylvania. January 22, 1894.)

No. 11.

1. PRINCIPAL AND SURETY—DISCHARGE—ALTERATION OF CONTRACT.
   Plaintiff purchased all the ore to be produced by a certain company within the ensuing year, and sold one-third of the amount under a contract which required that "shipments shall be made in as nearly equal monthly proportions as possible." Defendant became surety for the buyers. The parties to the contract construed it as requiring delivery of the whole amount of ore within the year, and they afterwards agreed that plaintiff should have one month longer in which to make delivery. *Held,* that this was such a change in the principal contract as to discharge the surety, who did not consent to it.

2. SAME.
   Even if plaintiff, under the original contract, was bound only to deliver the ore within a reasonable time, the subsequent agreement substituted for this a definite time, and is, on that theory, such a change in the principal contract as will discharge the surety.

At Law. Action by Alfred Earnshaw against Jerome L. Boyer. On motion to strike off nonsuit.

R. C. McMurtrie, for plaintiff.
John G. Johnson and T. P. Prichard, for defendant.

DALLAS, Circuit Judge. This action is against Jerome L. Boyer as surety. The principal contract, and that of the defendant, are as follows:

Philadelphia, January 29th, 1890.

Having purchased from the Marbella Iron Ore Company, under contract dated January 24th, 1890, the total output of their mines for the twelve months commencing March 1st, 1890, and ending March 1st, 1891 (expected to be from sixty to eighty thousand tons), together with an amount of washed Marbella sand, not to exceed one-third of the said mined ore actually shipped, I have sold to Messrs. Isaac McHose & Sons, Norristown, Pa., one-third of the ore shipped under said contract, on the following terms and conditions:

(1) Price to be at the rate of seven dollars and eighty cents per ton of twenty-two hundred and forty pounds for the mined ore, commonly known as "Marbella Lump," and seven dollars and forty cents for the sand ore, commonly known as "Marbella Sand."

(2) Freight Rate: The above prices are based on an ocean freight rate of twelve shillings per ton. All freight over twelve shillings to be added to the invoice as part of the price of the ore, and all freight under twelve shillings to be deducted from the invoice.

(3) Weight to be according to the United States customhouse certificate of weight.

(4) Payment to be made one-half in prompt cash on arrival of vessel, and the balance on presentation of invoice and customhouse certificate of weight.

(5) Shipment to be made in as nearly equal monthly proportions as possible.

(6) Delivery to be made f. o. b. cars of the Philadelphia and Reading Railroad Company at Philadelphia.

(7) Sellers not to be responsible for loss at sea nor on failure of the Marbella Iron Ore Company to deliver under their contract.

(8) Change of Duty: Should the government of the United States reduce or remove the existing duty of seventy-five cents per ton on iron ore, the

buyers to have the full benefit thereof, and any increase of the duty shall be paid by them.

Witness: Ambrose B. Umstead.                    [Signed]  Alfred Earnshaw.

The above contract is accepted with all the terms and conditions.

[Signed]  Isaac McHose & Sons.

Witness: Wm. C. Stokes, Norristown.

### Guarantee.

The undersigned, in consideration of Alfred Earnshaw agreeing to this contract, jointly and severally agree to accept and pay for the ores as the purchaser if Messrs. Isaac McHose & Sons refuse or neglect to do either.

[Signed]                                        Jerome L. Boyer.
                                                Wm. M. Kaufman.

January 29th, 1890,

A default in payment for the ore, as delivered under the contract between Isaac McHose & Sons and A. Earnshaw of this date, will discharge A. Earnshaw from the duty to make further delivery at his option.

[Signed]                                        Isaac McHose & Sons.
                                                Jerome L. Boyer.
                                                Wm. M. Kaufman.

The plaintiff's claim is for the amount, with interest, of his loss on contract price, arising upon resale of ore which he had tendered to Isaac McHose & Sons, and which they refused to receive, viz.:

| | |
|---|---:|
| Per steamer Hessle | $1,514 60 |
| Per steamer Nethergate | 3,040 60 |
| | $4,555 20 |

This cause having come on for trial at this term, a compulsory nonsuit was entered; and, upon the hearing of the plaintiff's motion to strike it off, the counsel for the defendant urged several grounds in support of the judgment of the court and against the motion; but I do not deem it necessary to discuss more than one of them. Upon reflection, and after examination of the authorities, I am satisfied that the ground upon which the nonsuit was ordered is, alone, sufficient to require that it should not be disturbed. I am still of opinion, as I was on the trial, that the evidence which had been adduced conclusively established that, at least in one respect, the principal contract had been changed after that of the surety had been made, and without his consent.

The plaintiff, having purchased the total output of the Marbella Iron Ore Company for the 12 months commencing March 1, 1890, and ending March 1, 1891, sold to Isaac McHose & Sons one-third of the ore shipped under said contract of purchase, and the only distinct provision contained in the plaintiff's contract of sale to McHose & Sons, with respect to shipments, is that they should be made in as nearly equal monthly proportions as possible. For the plaintiff it was contended that, in consequence of this omission, no particular time whatever was stipulated for shipment of all the ore, and that, therefore, under the law, the contract must be held to be for shipments to be completed in a reasonable time. Counsel for the defendant, on the other hand, contended that the contract, being correctly construed, required that the "as nearly equal monthly proportions as possible" should be all shipped in a definite, not an indefinite, number of months; and that, especially in

v.60F.no.4—34

view of certain circumstances of the case which it is not necessary for me to specify, it is evident that such was the contemplation of the parties, and the meaning of the agreement, and that the period allowed for shipments was intended to be the same period of 12 months as was covered by the plaintiff's purchase from the Marbella Company. But this question is not an essential one; for, in my opinion, a change in the contract, upon either construction of it, was effected by the correspondence now to be referred to. Among the letters in evidence is one of December 15, 1890, from McHose & Sons to the plaintiff, in which the contract is spoken of as "expiring February 28th, 1891." On December 17, 1890, the plaintiff wrote to McHose & Sons: "I have notified the Marbella Co. that, as they delayed shipments, at the beginning of the contract, a month, they will have to give us a month more to move the ore in, or else we shall be simply swamped with the quantity arriving so closely together. *I have taken it for granted that this will please you, but if you would prefer to have your one-third of the contract shipped by 1st March, please let me know.*" To this, under date of December 18, 1890, McHose & Sons replied: "The arrangement which you propose *regarding the extension of time* for the delivery of Marbella ore *is satisfactory;*" and this reply was taken as an acceptance of the proposal, and the arrangement referred to was, accordingly, pursued. It is quite manifest that the parties understood this to be a new agreement, by which the definite time which they both supposed had been originally agreed upon for the completion of shipments was extended for one month. But if this was a mistake; if the effect of the contract was to require that the shipments should all be made in a reasonable time, yet the substitution of a fixed and definite time would materially change it. The correspondence required and permitted the completion of shipments by a day certain, viz. the 1st of April, 1891; and the assertion that *this* was a reasonable time, and, therefore, might be written into the contract without varying it, does not meet the objection. The principals were dealing with a matter which concerned the surety as much as it did themselves, and yet (not considering this matter of reasonableness at all) they agreed upon an arbitrary time, without consulting him, and in utter disregard of his right either to be made a party to any such agreement, or to have the question of reasonable time determined by judicial investigation. The case presented is not of acceptance by the vendees of shipments under the original contract, but of partial substitution for that contract of a binding agreement, which varied the rights of the parties. McHose & Sons, without the consent of the defendant, and in modification of the contract to which his undertaking related, assented to a definite time for completion of shipments; and this they did by positive contract with the plaintiff,—not by merely remaining inactive (Samuell v. Howarth, 3 Mer. 272–278). The principles of law applicable to this case were considered by the supreme court in Reese v. U. S., 9 Wall. 14. Reese was surety in a recognizance conditioned that one Limantour "should personally appear at the next regular term of the circuit court to be held in the city of San Francisco, *and at any subsequent term to*

*be thereafter held in that city."* At the next subsequent term of that court the district attorney moved for, and obtained, a postponement of Limantour's trial, to which postponement he assented. The court below held that in this there was no ground for exemption of the bail from liability on the recognizance; but the supreme court, in an opinion delivered by Mr. Justice Field, reversing the judgment, said:

"The provision for his appearance at any subsequent term had reference to such subsequent term as might follow in regular succession in the course of business of the court. \* \* \* The stipulation to postpone \* \* \* was inconsistent with the condition of the recognizance. \* \* \* The stipulation, in other words, superseded the condition of the recognizance. \* \* \* The stipulation made without their consent or knowledge, between the principal and the government, has changed the character of the obligation. It has released him from the obligation with which they covenanted he should comply, and substituted another in its place. \* \* \* And the law upon those matters is perfectly well settled. Any change in the contract on which they are sureties, made by the principal parties to it without their assent, discharges them, and for obvious reasons. When the change is made they are not bound by the contract in its original form, for that has ceased to exist. They are not bound by the contract in its altered form, for to that they have never assented. Nor does it matter how trivial the change, or even that it may be of advantage to the sureties. *They have a right to stand upon the very terms of their undertaking.*

In Bonar v. MacDonald (3 H. L. Cas. 226–238), the English rule is stated in harmony with that laid down in Reese v. U. S., to be:

"That any variance in the agreement to which the surety has subscribed, which is made without the surety's knowledge or consent, which may prejudice him, or which may amount to a substitution of a new agreement for a former agreement, *even though the original agreement may, notwithstanding such variance, be substantially performed,* will discharge the surety."

The motion to strike off nonsuit is denied.